# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

LORENZO ALLEN,          )
          )
    Plaintiff,       )
          )
v.            )      Case No. CIV-22-138-AMG
          )
KILOLO KIJAKAZI,     )
  Acting Commissioner of the  )
  Social Security Administration,  )
          )
    Defendant.     )

## <u>MEMORANDUM OPINION AND ORDER</u>

Lorenzo Allen ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. (Doc. 1). The Commissioner has answered the Complaint and filed the Administrative Record ("AR") (Docs. 14, 15), and the parties have fully briefed the issues (Docs. 22, 35, 36).[1] The parties have consented to proceed before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Docs. 11, 12). Based on the Court's review of the record and issues presented, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Citations to the parties' briefs refer to the Court's CM/ECF pagination. Citations to the Administrative Record refer to its original pagination.

## I.  Procedural History

Plaintiff filed an application for DIB on August 18, 2020, alleging a disability onset date of November 16, 2016. (AR, at 236-37). The SSA denied the application initially and on reconsideration. (*Id.* at 85-97, 98, 100, 102-23). An administrative hearing was held on August 3, 2021. (*Id.* at 41-64). Afterwards, the Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (*Id.* at 12-36). The Appeals Council subsequently denied Plaintiff's request for review. (*Id.* at 1-4). Thus, the ALJ's decision became the final decision of the Commissioner. *Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009); 20 C.F.R. § 404.981.

## II.    Administrative Decision

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 16, 2016, the alleged onset date. (AR, at 17). At Step Two, the ALJ found that Plaintiff had the following severe impairments: traumatic brain injury, post-concussive headache disorder, degenerative disc disease of the cervical spine and the lumbar spine, right shoulder impingement syndrome, morbid obesity, major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder. (*Id.* at 18).

At Step Three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.* at 19). The ALJ then determined that Plaintiff had the RFC

> to perform light work as defined by 20 CFR 404.1567(b) except the claimant (1) can occasionally climb stairs and ramps; (2) can never climb ladders or scaffolds; (3) can occasionally balance, stoop, kneel, crouch and craw[l]; (4) can occasionally reach overhead and frequently reach in all other directions with the upper dominant extremity; (5) has no limitations with the non-

dominant upper extremity; (6) must avoid concentrated exposure to hazards such as unprotected heights and moving mechanical parts; and (7) cannot work in loud environments as defined by the Dictionary of Occupational Title[s]. Further, the claimant (1) can understand, remember and carry out simple instructions; (2) can have occasional interaction with supervisors, coworkers and the public; (3) can only make simple, work-related decisions; (4) can only tolerate occasional change in work location; and (5) cannot work at a strict production rate such as the rate required to work on an assembly line.

(*Id.* at 21-22). Then, at Step Four, the ALJ found that Plaintiff could not perform his past relevant work. (*Id.* at 34). At Step Five, the ALJ determined that when "[c]onsidering the claimant's age, education, work experience, and [RFC]," there are jobs that exist in significant numbers in the national economy that the claimant can perform, such as a collator operator or marker. (*Id.* at 34-35). Thus, the ALJ found Plaintiff had not been under a disability from November 16, 2016 through the date of the decision. (*Id.* at 35).

## III.   Claims Presented for Judicial Review

While Plaintiff's arguments are repetitive and somewhat difficult to discern, on appeal, he raises four points of error. First, Plaintiff contends the ALJ erred at Step Two of the sequential evaluation process by "failing to incorporate evidence showing disabling conditions." (Doc. 22, at 6; Doc. 36, at 4). Second, Plaintiff asserts the ALJ erred in her evaluation of Plaintiff's headache disorder and specifically, whether it was medically equivalent to listing 11.02. (Doc. 22, at 8-9). Third, Plaintiff argues the ALJ failed to properly evaluate Plaintiff's subjective reports of symptoms resulting from each of his medically determinable impairments. (Doc. 22, at 6-14; Doc. 36, at 8-9). Fourth, Plaintiff contends the ALJ failed to incorporate the appropriate limitations in the hypotheticals she

presented to the vocational expert ("VE") during the administrative hearing. (Doc. 22, at 13-14).

In response, the Commissioner argues that the ALJ conducted a proper analysis at Step Two. (Doc. 35, at 14-16). The Commissioner further contends the ALJ followed the proper SSA guidelines in evaluating Plaintiff's headache disorder. (*Id.* at 16-17). The Commissioner also asserts the ALJ reasonably accounted for Plaintiff's impairments and subjective reports by limiting him to less than a full range of light work with postural and mental limitations. (*Id.* at 17-18, 19-26). Finally, the Commissioner explains that the ALJ's Step Five findings were supported by substantial evidence. (*Id.* at 27).

## IV.    The Disability Standard and Standard of Review

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is an impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A medically determinable impairment must be established by "objective medical evidence" from an "acceptable medical source," such as a licensed physician or a licensed and certified psychologist; whereas the claimant's own "statement of symptoms, a diagnosis, or a medical opinion" is not sufficient to establish the existence of an impairment. 20 C.F.R. § 404.1521; *see* 20 C.F.R. § 404.1502(a), 404.1513(a). A plaintiff is disabled under the

Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (explaining five steps and burden-shifting process). To determine whether a claimant is disabled, the Commissioner inquires: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) considering the Commissioner's assessment of the claimant's residual functional capacity ("RFC"),[2] whether the impairment prevents the claimant from continuing claimant's past relevant work; and (5) considering assessment of the RFC and other factors, whether the claimant can perform other types of work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v). Plaintiff bears the "burden of establishing a prima facie case of disability under steps one, two, and four" of the SSA's five-step procedure. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). If the plaintiff makes this prima facie showing, "the burden shifts to the Commissioner to show the claimant has the [RFC] to perform other work in the national economy in view of [claimant's] age, education, and work experience." *Id.* "The claimant

---

[2] RFC is "the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 404.1545(a).

is entitled to disability benefits only if he is not able to perform other work." *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987).

This Court's review of the Commissioner's final decision is limited "to determining whether the Commissioner applied the correct legal standards and whether the agency's factual findings are supported by substantial evidence." *Noreja v. Comm'r, SSA*, 952 F.3d. 1172, 1177 (10th Cir. 2020) (citation omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, __ U.S. __, 139 S.Ct. 1148, 1154 (2019) (quotations and citation omitted). A court's review is based on the administrative record, and a court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). While the court considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quotations omitted). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## V.    The ALJ's Step Two Analysis Was Proper.

Plaintiff challenges the ALJ's Step Two finding that his sleep apnea and lumbar degenerative disc disorder were not severe physical impairments. (Doc. 22, at 7, 11-12).

At Step Two, the issue before the ALJ is whether the plaintiff suffers from at least one "severe" medically determinable impairment. *Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009). "[S]tep two is designed 'to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability.'" *Id.* (quoting *Bowen*, 482 U.S. at 156 (O'Connor, J., concurring)). In circumstances where an ALJ deems at least one impairment severe, and proceeds to the remaining steps of the evaluation, any error at step two in failing to deem a certain impairment severe is considered harmless. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (stating that "any error [at Step Two] became harmless when the ALJ reached the proper conclusion that [the plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Here, the ALJ found multiple severe impairments and proceeded through the remaining steps of the sequential evaluation. Thus, Plaintiff sustained his burden of proof at Step Two by demonstrating the existence of a medically determinable severe impairment, and the ALJ did not err in failing to identify other impairments as "severe."

**VI.   The ALJ's Step Three Consideration of Plaintiff's Headache Disorder is Not a Basis for Reversal.**

Plaintiff asserts that the ALJ did not properly consider whether his headache disorder was medically equivalent to the SSA listing for non-convulsive epilepsy. (Doc. 22, at 8-9). At Step Three of the sequential evaluation process, the ALJ must determine whether the plaintiff's alleged impairments, singly or in combination, meet or medically equal one of the impairments set forth in the Commissioner's Listing of Impairments ("the

listings"). 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings describe certain impairments the Commissioner considers disabling. 20 C.F.R. § 404.1525(a); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If a plaintiff's condition meets or medically equals the severity of a listed impairment, that impairment is conclusively presumed disabling. *Williams*, 844 F.2d at 751; *see Bowen*, 482 U.S. at 141 (noting that if the plaintiff's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled").

Social Security Ruling ("SSR") 19-4p details how an ALJ should consider primary headache disorders during Step Three. SSR 19-4, 2019 WL 4169635. Because a listing for migraine headaches does not exist under the regulations, the ALJ is required to compare the findings to "closely analogous listed impairments." 20 C.F.R. § 404.1526(b)(2). SSR 19-4p provides, "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for [epilepsy]), and we may find that his or her [medically determinable impairments] medically equals the listing." SSR 19-4p, 2019 WL 4169635, at *7.[3]

In their briefing before this Court, each party presented opposing arguments as to whether the ALJ complied with SSR 19-4p at Step Three. However, because Plaintiff

---

[3] In his Opening Brief, Plaintiff references equaling the listing for non-convulsive epilepsy, seemingly arguing it is the closest analogous listing to a headache disorder. (Doc. 22, at 9). Prior to September 29, 2016, listing 11.03 covered non-convulsive epilepsy and listing 11.02 covered conclusive epilepsy. Effective September 29, 2016, the SSA combined these two "epilepsy" listings into one under listing 11.02, thus removing listing 11.03. *See* Revised Medical Criteria for Evaluating Neurological Disorders, 81 FR 43048–01, 2016 WL 3551949, at *43056.

suffers from a secondary, rather than a primary, headache disorder, SSR 19-4p does not apply to Plaintiff's impairment.

In *T.B.M. v. Kijakazi*, 2023 WL 2587285 (D. Kan. March 21, 2023), the court recently explained the application of SSR 19-4p to primary as opposed to secondary headache disorders.

> SSR 19-4p "provides guidance on how [the Social Security Administration] establish[es] that a person has a medically determinable impairment (MDI) of a primary headache disorder and how [the Social Security Administration] evaluate[s] primary headache disorders in disability claims under titles II and XVI of the Social Security Act[.]" SSR 19-4p, 2019 WL 4169635, at *1 (S.S.A. Aug. 26, 2019). The Ruling explains that examples of a primary headache disorder "include migraines, tension-type headaches, and trigeminal autonomic cephalalgias." *Id.* at *3. As SSR 19-4p recognizes, "[p]rimary headache disorder is not a listed impairment in the Listing of Impairments[.]" *Id.* at *7. But "a primary headache disorder, alone or in combination with another impairment(s)" may "medically equal[ ] a listing" if "a person with a primary headache disorder ... exhibit[s] equivalent signs and limitations to those detailed in listing 11.02" for epilepsy (dyscognitive seizures). *Id.* . . . .
>
> **The Ruling also provides that "only a primary headache disorder" qualifies "as an MDI."** *Id.* **at *5. The Social Security Administration "will not establish secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as MDIs because secondary headaches are symptoms of another underlying medical condition[,]" and instead, it "evaluate[s] the underlying medical condition as the MDI."** *Id.*

*Id.* at *3-4 (emphasis added).

In the present case, the record is clear that Plaintiff suffers from a secondary, rather than a primary, headache disorder. In November 2016, Plaintiff began suffering from neck, back, and head pain following a workplace incident involving stacking bags of concrete.

(AR, at 353). The medical record from that date specifically noted that prior to the incident, Plaintiff had no medical history of these symptoms. (*Id.*)

On November 22, 2016, Plaintiff was seen at a follow up appointment. (*Id.* at 706). The examination notes indicate Plaintiff suffered from "headaches post concussion" and Plaintiff specifically reported, "Prior to this incident he did not have any headaches hardly at all." (*Id.*)  In June 2017, Plaintiff underwent an independent medical examination related to a worker's compensation proceeding. (*Id.* at 490). During the examination, Plaintiff reported that "he never had any difficulty with headaches until the day of the accident." (*Id.*). Plaintiff made similar reports during various examinations since that time. (*Id.* at 369-70, 436-37, 442, 668, 859). On February 21, 2018, Dr. Gabriel Pitman recorded that Plaintiff had previously experienced a traumatic brain injury and developed post-concussive headaches. (*Id.* at 665). Other physicians also referenced Plaintiff's headaches as post-concussive. (*Id.* at 441, 473, 480, 705, 859).

Plaintiff's headache disorder is clearly secondary to his traumatic brain injury suffered in November 2016. SSR 19-4p specifically defines secondary headache disorders as those "attributed to trauma or injury to the head or neck or to infection." SSR 19-4p, 2019 WL 4169635, at *5. Accordingly, the SSA does not consider Plaintiff's headache disorder, standing alone, a medically determinable impairment and thus, the ALJ was not required to determine medical equivalency under SSR 19-4p. *Id.* at *2, 5. *See also Gutierrez v. Kijakazi,* 2023 WL 2614456, at *5-6 (D.N.M. March 23, 2023) (explaining that under SSR 19-4p, the ALJ is only required to consider a secondary headache disorder in Step Three when determining the RFC and not in determining whether the plaintiff meets

or equals a listing); *Melissa H. v. Kijakazi*, 2022 WL 4381158, at \*2-3 (D. Utah Sept. 22, 2022) (affirming decision where the ALJ considered the plaintiff's secondary headache disorder stemming from vehicular accident at Step Three in determining RFC but did not apply SSR 19-4p).[4] Because SSR 19-4p does not apply to Plaintiff's headache disorder, this assertion of error is without merit.

## VII.  The ALJ's Evaluation of Plaintiff's Subjective Reports Is Supported by Substantial Evidence.

Throughout Plaintiff's Opening Brief, he asserts that the ALJ erred in her consideration of his subjective reports of pain and limitations. As established below, the ALJ's decision negates this assertion in that she thoroughly examined Plaintiff's subjective reporting of her symptoms and limitations.

This Court's review of the ALJ's consideration of Plaintiff's subjective reports is guided by two principles. First, such "determinations are peculiarly the province of the finder of fact, and [the court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Second, "findings as to [subjective reports] should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (additional alteration omitted).

---

[4] Plaintiff does not raise an issue on appeal regarding whether his traumatic brain injury meets either listing 11.18 (Traumatic Brain Injury) or listing 12.02 (Neurocognitive Disorders, Traumatic Brain Injury). 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A-2, §§ 11.02, 12.02.

Following a thorough discussion of the medical evidence of record (AR, at 22-33), the ALJ set out her findings regarding Plaintiff's subjective reports and then determined the RFC relating to each of his impairments. (*Id.* at 33-34). The ALJ began with the general statement, "[t]he claimant's statements and allegations about the intensity, persistence, and limiting effects of his symptoms and impairments are not consistent with the evidence of record." (*Id.* at 33). More specifically, the ALJ explained, "As summarized above, the evidence of record shows an extensive treatment history since the claimant's November 2016 injury (Exhibit 1F, 2F, 4F-7F, 9F-11F, 18F). I have not summarized every single treatment encounter in the record and have focused on the more salient encounters." (AR, at 33). The ALJ then discussed Plaintiff's specific impairments and resulting limitations. Because Plaintiff challenges the ALJ's evaluation of his subjective symptoms arising from each of his impairments, the Court has addressed each impairment individually below.

A.    **Sleep Apnea & Hypothyroidism**

Plaintiff contends the ALJ ignored his non-severe impairments of sleep apnea and hypothyroidism in determining the RFC. Specifically, Plaintiff states, "The ALJ [] failed to determine Claimant's severe sleep apnea as non-severe in spite of the medical record and failed entirely to discuss symptoms from Claimant's [] sleep apnea causing fatigue; the ALJ only noted Claimant's sleep apnea three times without analysis on the impacts on Claimant's functioning []." (Doc. 22, at 7). This assertion is simply inaccurate. At Step Two in her decision, the ALJ explained:

> Although not alleged as an impairment, the evidence of record shows a historical diagnosis of obstructive sleep apnea. The medical evidence of record shows this was diagnosed at some point in the past but it is not clear

as to when [(AR, at 682)]. In July 2020, the claimant was referred for a repeat sleep study [(AR, at 395, 688)]. In February 2021, the claimant reported he never completed the sleep study [(AR, at 898, 901, 919)]. While the evidence of record indicates that the claimant may have obstructive sleep apnea, its severity and contribution to other impairments during the relevant time period remains unclear from the record. In short, the evidence of record does not show that this impairment causes more than minimal vocationally relevant limitations. Thus, I find that it is nonsevere.

(AR, at 18).

Similarly, Plaintiff states that the ALJ minimized or ignored Plaintiff's hypothyroid symptoms. (Doc. 22, at 9). On the contrary, in her decision, the ALJ explained:

Although not alleged as an impairment, the evidence of record shows a diagnosis of low thyroid levels. In January 2016, testing showed low TSH [(AR, at 748)]. In February 2016, a thyroid scan was unremarkable [(AR, at 421, 734-35)]. That month, the claimant was seen by endocrinology and diagnosed with subclinical hyperthyroidism [(AR, at 716-17)]. In March 2021, laboratory testing showed TSH levels within normal limits (AR, at 941)]. In short, the evidence of record does not show that this impairment causes more than minimal vocationally relevant limitations. Thus, I find that it is nonsevere.

(AR, at 18).

The ALJ clearly discussed Plaintiff's sleep apnea and hypothyroidism, set forth an accurate summary of the medical record pertaining to each, and linked her findings that they do not cause more than minimal limitations to specific findings in the record. *See Smith v. Colvin*, No. CIV-13-617-F, 2014 WL 4384705, at *2 (W.D. Okla. Sept. 3, 2014) ("[A] finding at step two that a medically determinable impairment poses no restrictions on a claimant's work activities obviates the need for further analysis at step four."). The ALJ properly performed his analysis of these impairments.

### B.    Shoulder and Back Impairments

Plaintiff next challenges the ALJ's evaluation of his reported symptoms arising from lumbar and cervical spine degenerative disc disease and right shoulder impingement syndrome. With regard to these impairments, the ALJ explained:

> Other than for the right shoulder surgery, the claimant has generally received conservative treatment for his complaints. Treatment over the past five years has consisted of medication management, physical therapy and various injections (Exhibit 1F, 2F, 4F-7F, 9F-11F, 18F). In terms of the claimant's musculoskeletal impairments, the orthopedic and pain management records reflect persistent complaints of pain despite treatment (*id.*). However, the pain management records consistently state the claimant's pain symptoms are stable [(AR, at 778, 781, 784, 786, 789, 793, 796, 802, 811, 817, 824, 826, 838, 841)]. The physical examinations have varied of the relevant time period, but have consistently shown abnormalities such as paraspinal tenderness and tension, reduced range of motion of the neck and trunk due to pain and guarding and reduced range of motion of the right shoulder but have also consistently shown intact gross muscle strength, normal sensation and intact gait [(AR, at 491-92, 532, 586-87, 604, 622-23, 664, 669, 694-95, 708, 790, 833, 860-61, 877, 945-46, 948-49)]. The claimant's morbid obesity may contribute to his musculoskeletal impairments and pain symptoms. . . . The residual functional capacity outlined above incorporates the consideration of factors that would potentially aggravate the claimant's existing conditions and/or associated functional loss as well as potential side effects of treatment, and incorporates precautionary limitations due to these conditions. In regard to the claimant's musculoskeletal conditions, the exertional and positional limitations incorporates the consideration that any further increase in weight and/or more frequent positional exposure would potentially cause further joint degeneration and subsequent pain and dysfunction. For the reasons stated, I find the claimant has the ability to perform the residual functional capacity outlined above.

(AR, at 33-34). While the ALJ merely summarized the records in this portion of the decision, she had already discussed these records in great detail. (*Id.* at 23-20). *See, cf., Endriss v. Astrue*, 506 F. App'x 772, 775 (10th Cir. 2012) ("[T]he ALJ cited to a number of exhibits in the record," and though she "did not provide a contemporaneous discussion

of those records," the ALJ had made observations about the evidence in those exhibits "just a few pages earlier.").

Plaintiff asserts general arguments that the RFC limitations are not sufficient because various medical providers documented Plaintiff's descriptions of pain and observed direct physical evidence of the same. (Doc. 22, at 10). In her review of the medical record as a whole, however, the ALJ discussed those descriptions and observations, as well as the examination notes that showed improved reports and findings. (AR, at 23-24, 25, 26-28, 29-30, 31).

Plaintiff also asserts the ALJ cherry-picked Plaintiff's reports of daily activities in order to find him capable of work, such as Plaintiff's ability to drive a car, shop, and handle household finances. (Doc. 22, at 13). However, the ALJ considered all of Plaintiff's reported daily activities, not just those noted by Plaintiff in his Opening Brief. (AR, at 20-21, 22-23). She specifically tied her findings that Plaintiff's subjective reports of daily activities were not consistent with the record to examinations that frequently showed muscle strength, normal gait and reflexes, and only some decreased range of motion. (*Id.* at 22-30).

Plaintiff also complains that the ALJ considered Plaintiff's ability to attend his daughter's graduation party at Universal Studios in Orlando, Florida, but did not consider that he had to use a scooter during the trip. (Doc. 22, at 7). A review of the ALJ's decision reveals that she discussed Plaintiff's trip to Universal Studios primarily with regard to his report that he had difficulty being around crowds due to anxiety. (AR, at 20, 28).

Finally, in order to successfully challenge an RFC determination, a plaintiff must articulate a specific limitation he experienced from his physical impairments, severe or otherwise, that the ALJ erroneously failed to include in the RFC. *See McAnally v. Astrue,* 241 F. App'x 515, 518 (10th Cir. 2007) ("[W]e agree with the magistrate judge that, with regard to her hypertension, loss of vision or skin problems, the claimant has shown no error by the ALJ because she does not identify any functional limitations that should have been included in the RFC assessment or discuss any evidence that would support the inclusion of any limitations.") (quotations and alterations omitted); *Denman v. Saul,* No. CIV-18-640-G, 2019 WL 4059185, at *4 (W.D. Okla. Aug. 28, 2019) (affirming the ALJ's RFC where the plaintiff "fail[ed] to identify the specific limitations he believes were . . . [erroneously] omitted from the RFC"); *Morgan v. Berryhill,* No. CIV-17-413-BMJ, 2018 WL 652335, at *6 (W.D. Okla. Jan. 31, 2018) (affirming the Commissioner's decision where the plaintiff failed to identify "any additional functional limitations that the ALJ should have included" in the RFC). Though not a model of clarity, Plaintiff appears to assert that the ALJ should have included a limitation precluding all overhead and extension movement in both upper extremities. (Doc. 22, at 13). However, as noted by the ALJ, Plaintiff only testified that he could not raise his right hand above his head. (AR, at 22). Plaintiff does not cite to any portion of the record indicating a complete inability to reach overhead by either arm.

Overall, Plaintiff simply disagrees with the conclusions drawn by the ALJ, and his disagreement is centered on arguments that would impermissibly require this Court to reweigh the evidence. *See White*, 287 F.3d at 909 (recognizing that much of the medical

evidence was in conflict but the ALJ weighed all the evidence in reaching his decision and the court could not "now reweigh that evidence and substitute [its] judgment for his"). *See also Fannin v. Comm'r, SSA*, 857 F. App'x 445, 448 (10th Cir. 2021) (noting that reweighing the evidence "exceeds the scope of substantial-evidence review"); *Alarid v. Colvin*, 590 F. App'x 789, 795 (10th Cir. 2014) ("In citing what he contends is contrary evidence [to the ALJ's conclusion regarding the severity of the claimant's impairments] Mr. Alarid is asking us to reweigh the evidence, which we cannot do.").

## C.    Headache Disorder

Plaintiff also argues that the ALJ erred in her consideration of his headaches by not incorporating further limitations into the RFC. Following a detailed discussion of Plaintiff's headache related medical history, the ALJ stated:

> In terms of the claimant's headaches, the neurological workup shows negative imaging of the brain, a negative EEG and no neurological deficits on the examinations (Exhibits 1F, 2F, 5F, 9F, 10F, 18F). The claimant has repeatedly reported improvement in his symptoms with medications, such as Amerge (*id.*). As stated in SSR 19-4p, headaches are complex neurological disorders involving recurring pain in the head, scalp or neck. Since pain can be subjective, headaches also can be subjective and difficult to objectively assess. The evidence of record shows that very early on in the claimant's treatment that it was opined his headaches could be related to muscle tension, rebound headaches, poor sleep, stress and blood pressure [(AR, at 695, 698)]. Later records, note concerns of polypharmacy and a psychological overlay [(AR, at 790, 799, 820, 827, 832-34)]. In short, the claimant's headaches symptoms are complex and may be impacted by multiple other issues.

(AR, at 33).

Plaintiff first asserts the ALJ should have ordered a consultative examination if she "felt there was not enough evidence to support Claimant's position that his headaches were disabling . . . ." (Doc. 22, at 11). This statement misunderstands each party's burden in

these proceedings. "[T]he burden to prove disability in a social security case is on the claimant." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). An ALJ does "bear[] responsibility for ensuring that an adequate record is developed during the disability hearing consistent with the issues raised." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (quotations omitted). While this responsibility may require the ALJ to order a consultative examination, *see Hawkins*, 113 F.3d at 1166, she is given broad latitude in her determination of whether to do so. *Id.* at 1169. Such examinations may be required "where there is a direct conflict in the medical evidence;" "where the medical evidence in the record is inconclusive;" or "where additional tests are required to explain a diagnosis already contained in the record." *Id.* at 1166; *see also* 20 C.F.R. § 404.1519a(b) (describing when a consultative examination may be appropriate). Here, Plaintiff wholly fails to identify conflicting or inconclusive medical evidence in relation to his headaches.

Plaintiff also criticizes the ALJ's reference to neurological testing that showed "negative imaging of the brain, a negative EEG and no neurological deficits on the examinations." (Doc. 22, at 9). Had the ALJ relied on objective medical testing alone in determining Plaintiff's RFC, this could be a basis for reversible error. However, the ALJ discussed Plaintiff's reports and examinations in great detail.

Plaintiff also asserts the ALJ did not discuss that physicians consistently prescribed him medications for pain, including narcotics. (*Id.* at 12). The ALJ's decision is replete with discussion of Plaintiff's medications and their effectiveness, as well as physician concerns regarding the quantity of Plaintiff's narcotic medications.

The ALJ noted that in December 2016, Dr. Andrea Fraley recommending weaning Plaintiff off of Norco due to concerns regarding rebound headaches, and she prescribed Gabapentin, Cyclobenzaprine, and Prednisolone. (AR, at 24). In February 2018, Dr. Pitman prescribed Imitrex, Phenergan, Amitriptyline, and Meloxicam for headaches and nausea. (*Id.* at 26). The following month, Plaintiff reported that his headaches persisted in spite of his use of Imitrex, but that Amitriptyline was helpful. (*Id.*) He also reported that he never filled his Phenergan prescription. (*Id.*) Dr. Pitman continued the same medications. (*Id.*)

Later that month, Plaintiff visited Dr. Jason Leinen for pain management and reported that Zanaflex, Meloxicam, and Norco were helpful. (*Id.*) Dr. Leinen agreed to take over Plaintiff's pain management and prescribed those three medications. (*Id.* at 27). The ALJ noted that Plaintiff returned for monthly follow-up appointments over the next year. (*Id.*)

In May 2018, Plaintiff returned to Dr. Pitman and reported that Hydrocodone was helpful for pain. (*Id.*) Dr. Pitman discontinued Plaintiff's prescription for Imitrex and started him on Amerge. (*Id.*) The following month, Plaintiff reported that his headaches had improved and at worst, were 5 out of 10 on the pain scale. (*Id.*) In August 2018, Dr. Pitman continued Plaintiff's previous medications and added Trazadone. (*Id.*)

In January 2019, Plaintiff reported to Dr. Pitman that he was only experiencing slight headaches that waxed and waned. (*Id.* at 28). He also reported sleeping better with Trazadone. (*Id.*) Dr. Pitman continued Plaintiff's prescriptions for Trazadone, BuSpar, Paxil, Phenergan, and Amerge. (*Id.*)

In February 2019, Plaintiff visited Dr. Leinen who noted having received "correspondence about the claimant's medication usage given that he is taking multiple substances that could perhaps have a sedating or neurocognitive impact." (*Id.*) (quotations omitted). Plaintiff reported that his medications were "working fairly well at controlling his pain." (*Id.*) Dr. Leinen recorded "concerns [] about polypharmacy and multiple medication usage in general" and recommended Plaintiff wean down some of his medications. (*Id.* at 28-29). Dr. Leinen nevertheless continued Plaintiff's prescriptions for Meloxicam, Percocet, and Zanaflex. (*Id.* at 29).

Also in February 2019, Plaintiff reported that his headaches had returned during the latter half of the month. (*Id.* at 28). Plaintiff described their pain level as 3 to 5 out of 10. (*Id.*) Dr. Pitman prescribed Seroquel and Hydroxyzine, and provided a Toradol injection. (*Id.*) In April 2019, Plaintiff reported the medications were helpful and did not report any side effects. (*Id.*) Dr. Pitman continued his medications and added Amantadine. (*Id.*) The ALJ noted that Plaintiff refilled his prescriptions for the following four months. (*Id.*)

In May 2019, Dr. Leinen recommended weaning Plaintiff from his pain medications, but Plaintiff requested increases in September, October, and November 2019. (*Id.* at 29). Dr. Leinen wrote that Plaintiff "tends to exaggerate his symptoms a bit" and "certainly has some underlying psychological pathology playing a role in his clinical picture." (*Id.*) In December 2019 and March 2020, Dr. Leinen recorded similar concerns, including that there was "a lot of psychological overlay playing a significant role with management of his pains." (*Id.*)

In April 2020, Plaintiff reported to Dr. Pitman that his headaches worsened with a reduction of Amantadine and a "worsening temper over neighbor and pharmacist." (*Id.*) Dr. Pitman continued Plaintiff's prescriptions for Seroquel, Hydroxyzine, Trazadone, BuSpar, Paxil, and Amerge. (*Id.*) The following month, Plaintiff reported medications were helpful and he was not experiencing side effects. (*Id.*)   In September 2020, Plaintiff reported to Dr. Leinen that his medications were working well but he did have some breakthrough pain with weather changes or increased exertion. (*Id.*) Dr. Leinen continued Plaintiff's prescriptions for Zanaflex and Percocet, and Plaintiff followed up for refills in November 2020 and January 2021. (*Id.* at 30).

In December 2020, Plaintiff reported to Dr. Pitman that his headache pain was 3 to 4 out of 10, and that his medications were helpful, his occipital pain was controlled with narcotics, and his blood pressure medications helped his headaches. (*Id.*) Dr. Pitman continued Plaintiff's medications. (*Id.*) In March 2021, Plaintiff reported that his headaches had worsened in severity, but his physical examination was unchanged, and Dr. Pitman continued Plaintiff's medications. (*Id.*)

This detailed discussion of Plaintiff's complete medication history, including frequent reports of improvement with medication, as well as his pain management physician's repeated concerns about Plaintiff's use of said medication, is set forth in the ALJ's decision. Thus, contrary to Plaintiff's assertions in his Opening Brief, the ALJ clearly considered that physicians consistently prescribed medications for pain, including narcotics.

Plaintiff does not specify a limitation related to his headache disorder the ALJ should have included in the RFC. Late in his Opening Brief, though, he asserts the ALJ should have determined the number of days Plaintiff would be absent from work based on his impairments and included the same in evaluating the RFC. (Doc. 22, at 15). Plaintiff may have intended this limitation to relate to his headache disorder. Regardless, the Court notes that it is Plaintiff's burden, not the ALJ's, to provide evidence supporting RFC limitations, including necessary absences from work. Plaintiff does not assert how many days per week he would need to miss, nor does he attempt to substantiate his claim with citation to the medical record. *See, cf., Razo v. Colvin*, 663 F. App'x 710, 717 (10th Cir. 2016) (finding the ALJ did not err in declining to limit RFC based on the plaintiff's alleged "need to take time off work for medical appointments" where the plaintiff did not "substantiate his claim with the medical records," and explaining, "[w]e decline to search the voluminous administrative record to ascertain how many appointments each week Mr. Razo could be expected to attend."); *see also Murrell v. Shalala*, 43 F.3d 1388, 1390 n.2 (10th Cir. 1994) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Similar to the court in *Razo*, this Court will not speculate as to the number of absences the record might support. Accordingly, the Court finds Plaintiff's assertion of error fails.

### D.    Mental Impairments

Next, Plaintiff claims the ALJ erred in consideration of reported symptoms related to his mental impairments. The ALJ found that Plaintiff suffered from major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder. (AR, at 18). The

ALJ determined that as a result of these impairments, Plaintiff was limited to simple instructions and decisions, only occasional interaction with others, only occasional changes in work location, and a preclusion of strict production rates. (*Id.* at 21-22).

Plaintiff again fails to specify the limitation he thinks the ALJ should have included in the RFC. As established, this is fatal to Plaintiff's claim of error. *McAnally,* 241 F. App'x at 518; *Denman*, 2019 WL 4059185, at *4; *Morgan*, 2018 WL 652335, at *6, *supra*. Accordingly, the Court will not conduct a general review of the ALJ's consideration of Plaintiff's mental health impairments. Out of an abundance of caution, however, the Court has addressed below Plaintiff's specific criticisms of the ALJ's decision in this regard.

Plaintiff challenges the ALJ's reliance on multiple medical examiners who noted their opinion that Plaintiff was exaggerating his symptoms. (Doc. 22, at 10). Specifically, Plaintiff states that while Dr. David E. Johnsen found that Plaintiff was exaggerating his symptoms, the ALJ should not have relied on that in considering Plaintiff's subjective reports because Dr. Johnsen stated that Plaintiff's "extremely dramatic behavior displays are a cry for help to pay attention to complaints." (*Id.*)

Dr. Johnsen's report stated, in relevant part:

While it is apparent that Mr. Allen consciously attempted to make himself appear more impaired than he actually is, the motivation for such symptom exaggeration is unclear. It is possible that the motivation is that of malingering for the purpose of external secondary gain, such as financial compensation or more internal secondary gain, such as needing to justify his continued unemployment. However, it is also possible that his motivation is more of a "cry for help" in which he is trying to make sure those around him pay attention to his complaints. His extremely dramatic behavior displays certainly provide a measure of support for the latter hypothesis. Additionally, while it is possible that Mr. Allen could have experienced some mild cognitive difficulties shortly after his fall, any such deficits after a mild

> concussion such as what he experienced would have resolved or at least
> significantly improved after 15 months post injury so that there is no need
> for any type of cognitive retraining or rehabilitation.

(AR, at 441). Significantly, while Dr. Johnsen speculated as to Plaintiff's motivation for

exaggeration, the fact remains that Dr. Johnsen concluded that Plaintiff was exaggerating

his symptoms. Moreover, and contrary to Plaintiff's assertion in his Opening Brief (Doc.

22, at 10), one treating physician, Dr. Leinen, also stated that "Plaintiff tends to exaggerate

his symptoms a bit." (AR, at 29 (citing *id*., at 820)).

In any event, Plaintiff failed to identify a limitation the ALJ should have included

in the RFC arising from Plaintiff's mental impairments. Accordingly, Plaintiff's assertion

of error fails.

### E.    Obesity

Finally, Plaintiff objects to the ALJ's consideration of obesity and specifically, how

it affects his other impairments. (Doc. 22, at 11-12). As the Commissioner notes, this

argument is directly belied by the ALJ's decision. The ALJ considered Plaintiff's obesity

throughout his decision. At Step Two, the ALJ determined Plaintiff's obesity was a severe

impairment. (AR, at 19). At Step Three, pursuant to SSR 19-2p, the ALJ engaged in a

substantial analysis of Plaintiff's obesity and its resulting functional limitations, if any. (*Id.*

at 19); *see also* SSR 19-2p, 2019 WL 2374244. In determining the RFC, the ALJ

specifically considered that Plaintiff's "obesity may contribute to his musculoskeletal

impairments and pain symptoms" and ensured that the RFC limitations accounted for "any

further increase in weight . . . ." (AR, at 33-34).

Plaintiff asserts, in conclusory fashion, that his obesity has an inevitable impact on his remaining impairments and therefore, should have resulted in additional or more severe limitations in the RFC. (Doc. 22, at 11-12). However, Plaintiff's assertion is misguided. Further limitations are not presumed merely by the presence of obesity. "Plaintiff points to no evidence in the medical record reflecting 'functional limitations from [his] obesity or of any impairments possibly caused or exacerbated by [his] obesity that are inconsistent with the RFC[,] . . . .' *Jimison ex rel. Sims v. Colvin*, 513 F. App'x 789, 798 (10th Cir. 2013), and the ALJ need not speculate as to the impact of [his] obesity." *Owings v. Kijakazi*, No. CIV-20-1295-SM, 2021 WL 6197421, at *4 (W.D. Okla. Dec. 30, 2021) (citing *Fagan v. Astrue*, 231 F. App'x 835, 837-38 (10th Cir. 2007) ("The ALJ discussed the evidence and why he found [the claimant] not disabled at step three, and, the claimant—upon whom the burden rests at step three—has failed to do more than suggest that the ALJ should have speculated about the impact her obesity may have on her other impairments.")). Accordingly, the Court finds no error in the ALJ's consideration of obesity.

## VIII.   The ALJ Presented Proper Hypotheticals to the Vocational Expert.

In his final issue on appeal, Plaintiff contends the ALJ erred at Step Five of the sequential evaluation process. (Doc. 22, at 13-14). This assertion, however, is based upon Plaintiff's contention that the ALJ erred by failing to present a hypothetical question to the VE that included additional limitations not included in the RFC. Plaintiff's argument is closely related to the arguments discussed above, as Plaintiff contends the ALJ's failure to properly consider and evaluate his subjective reports regarding the intensity, persistence, and limiting effects of his impairments led to him posing an incomplete RFC hypothetical

to the VE. For the reasons discussed above, the ALJ's RFC determination is supported by substantial evidence, and the ALJ was under no obligation to include limitations in the RFC that are not supported by the record. *See Smith v. Colvin*, 821 F.3d 1264, 1270 (10th Cir. 2016) ("The [ALJ] had to ask only about the effect of those limitations ultimately assessed; the judge did not need to ask about the effect of limitations that he didn't believe applied.").

## IX. Conclusion

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned **AFFIRMS** the decision of the Commissioner for the reasons discussed above.

**SO ORDERED** this 4th day of May, 2023.

AMANDA MAXFIELD GREEN
UNITED STATES MAGISTRATE JUDGE